# Law and Equity

IN THE

# SUPREME COURT

OF THE

# STATE OF NEW YORK.

---

VALTON and ADAMS *vs.* THE NATIONAL LOAN FUND LIFE
ASSURANCE SOCIETY.

Upon the deposition of a witness, taken on commission, being offered in evi-
dence at the trial, the defendants objected, on the ground that two cross-inter-
rogatories, one embracing nineteen questions and the other five, were
unanswered in part, but in what respect they were unanswered was not spe-
cifically stated. After the deposition had been received and read, the same
objection was renewed, and exception taken. *Held*, that it would be an un-
justifiable exercise of discretion to suppress the entire deposition, upon such
a vague and indefinite objection; and that the refusal to do so was no ground
for a new trial. HARRIS, J., dissented.

It is only when the officer neglects to put the interrogatories, as settled, or when
the witness *refuses* to answer, that the deposition will be suppressed, on the
ground of the commission having been imperfectly executed.

Where a witness has not been impeached, nor any foundation laid for his im-
peachment, by showing contradictory statements made by him as to a material
fact, and he has not been interrogated as to what he said in a particular con-
versation, proof of declarations made by him on that occasion, in the absence
of the party by whom he is called, cannot be received. HARRIS, J., dis-
sented.

VOL. XXII.                    2

Where an individual makes a contract of life insurance, in his own name, the legal presumption is that the policy is for his benefit, and not for that of any other person.

A person has an insurable interest in his own life; and no use made by the assured, of the policy, *subsequent* to the contract of insurance, will convert it into a wager policy. If valid in its inception, he may dispose of it as he pleases. HARRIS, J., dissented.

There can be no wager policy, within the statute, unless the contract of insurance is made with a party who has no insurable interest in the life insured. The term can never apply when the policy is issued to the party whose life is insured, and when thus the contract is made directly with him. HARRIS, J., dissented.

It is only when an insurance contract falls within the category of a mere wager or bet—a simple gaming adventure—that the statute against wagers can, even by construction, apply.

It is always a question of legal construction, whether an insurance contract comes within the purview of the statute.

Where a party insures *his own life*, even if it be for the benefit of another, the latter advancing the money to pay the premium, such contract is not void for the reason that the statute against betting and gaming has been violated; *it seems.* *Per* WRIGHT, J.

Where M. V. & S. formed a partnership, the capital being furnished by M. and V.; and S. although advancing no capital, was to share equally in the profits on account of his skill in the business, but in lieu of capital, on the part of S., and as an indemnity to his copartners, an insurance was effected on his life, with the understanding that if he should die, unmarried, during the continuance of the partnership, the benefit of the policy should go to the survivors of the firm; *Held* that although M. urged the making of the contract, and aided in its successful completion, yet as the insurance was effected by S. in his own name, and not as the agent of M. and V. or for their exclusive benefit, but for the benefit, in part at least, of S., the policy was not void as being a wager policy. HARRIS, J., dissented.

THIS cause was tried before Mr. Justice WRIGHT, at the Albany circuit in November, 1852. The action was upon a policy of insurance in the sum of $10,000, effected on his own life by Conrad Schumacher, late a liquor merchant of the city of Albany. The complaint alleged the making of the contract of insurance between the deceased and the defendants, and the issuing of a policy to the assured in the month of May, 1850, to continue in force through his life or so long as he should continue to pay a premium of $68.75, in advance, on or before each successive quarter day. The complaint also alleged

that in the same month, a mutual copartnership agreement, in writing, was concluded between Schumacher and Gerhart Valton and Daniel Martin, the three composing the firm of Valton, Martin & Co. by which it was, among other things, agreed that in case of the death of Schumacher *unmarried* during the continuance of the partnership, the policy should belong to Valton and Martin, the surviving members of the firm. The plaintiffs alleged that Schumacher died unmarried during the continuance of the partnership; that the quarterly premiums upon the policy were paid by the assured, including the advance premium for the quarter current at the time of his death; that due proof of his death was furnished to the company; that all the stipulations, conditions and warranties to be complied with on the part of the assured were kept and performed; and that subsequent to the death of Schumacher, Martin assigned his interest in the policy to the plaintiff Adams.

The answer contained, 1. A qualified and informal denial by the defendants of any knowledge, information or belief that they issued the policy in question. 2. A qualified and informal denial of knowledge or information that Schumacher died at the time alleged. 3. An allegation that they issued the policy to Schumacher upon his proposal, which was the basis of the contract. 4. That the assured and his partners represented him as a merchant, a member of their firm, and a man of large means; that he was described in his policy as a merchant; that the defendants believed it; that it was all false and fraudulent, and the policy void. 5. That proof was never furnished of the age of the assured, nor of the fact, time or manner of his death. 6. That one Parke is administrator of Schumacher, owns the policy, is prosecuting another suit for the benefit of Valton and Martin, and is the real party in interest in this suit. 7. They deny any knowledge of the partnership agreement between Schumacher, Valton and Martin, and aver it to have been fraudulent. 8. They deny knowledge whether the premiums were paid, &c. and aver, on information, that the policy was obtained with the fraudulent intent to secrete or otherwise dispose of the assured, and claim the amount of the

insurance.   9. They deny knowledge of the assignment by Martin, of his interest to the plaintiff, Adams.

On the trial it appeared on the part of the plaintiffs that Valton, Martin & Co. were liquor merchants, and opened their store in Albany, in April, 1850.   They were partners, and were publicly known as such from the commencement, though written articles were not executed until about the 30th of May. On the 20th of May, Schumacher applied to the defendants' agent at Albany, for an insurance upon his life.   A policy was issued by the defendants on the certificate of their agent and medical examiner, and the application and accompanying papers; and the defendants ante-dated the policy as of the 15th of May.   The assured was in good health, unmarried, thirty-three years of age, a native of Germany, and for over six years a resident of the United States.   He was skilled in his calling before he came to this country, and this was one of the inducements to the partnership between him and Martin and Valton. It was proved that he was drowned in the Hudson river opposite the city of New York, on the 4th of September, 1850. On the 7th of September, the body was found and buried by the coroner of Jersey City, and subsequently recognized on disinterment, not only by its general appearance, but by the wearing apparel, which was clearly identified, as well by the friends of the deceased, as by the tradesmen from whom portions of it had been purchased.   The requisite proofs were furnished to the defendants, and no objection was taken to their sufficiency.

On the part of the defendants, evidence was introduced tending to show that though the policy was issued to Shumacher, and on his application, his partner, Martin, aided him in procuring it; that Martin paid the premiums; that he represented Schumacher to be his partner, and a moneyed man; that Schumacher, among other things, did business about the establishment which would have been appropriate to a porter's employment; that his dress and deportment were those of a man of limited means; that the surviving members of the firm terminated their partnership connection in the course of the following year; that Oltman, who was with Schumacher when he was drowned, was

Valton *v.* National Loan Fund Life Assurance Society.

an employee of the firm of Valton, Martin & Co., and removed some six months afterwards to one of the western states; and that it was unusual for the bodies of persons drowned in the Hudson to be washed ashore, as in this instance, within three days after death. Upon several of these questions the evidence was conflicting. It was proved that the money advanced by Martin to the defendants by way of premium, was received by him for that purpose from Schumacher, the assured.

The testimony being closed, the judge charged the jury that it was essential to the maintenance of the action that they should be satisfied from the evidence that Schumacher was in fact dead. If he was, that the action was sustained, *unless* there had been a false warranty, or *unless* the policy was obtained from the defendants by fraud, or with the fraudulent intent, on the part of Valton and Martin, or one of them, to which the insured was cognizant, of thereafter secreting or disposing of Schumacher, and making claim to the insurance under their articles of copartnership, and that such fraudulent intent had been consummated; that if the insured untruly represented that he was a partner in the firm of Valton, Martin & Co., or that he was the *moneyed man* of the firm, and that either or both such representations were material to the risk, the policy was avoided and there could be no recovery : but if such representations were true, or, if not true *were not material* to the risk, the action, *prima facie,* was sustained.

The judge further charged the jury, that one branch of the defense was that the policy had been obtained fraudulently; that Valton and Martin, in conjunction with Schumacher, had fraudulently conspired to obtain from the defendants the policy with the fraudulent intent of secreting or disposing of Schumacher and making claim to the insurance, and that Schumacher had been secreted or disposed of with such fraudulent intent; that, to sustain this defense, evidence had been given of the representations of Martin in the presence of Schumacher, prior to the issuing of the policy, and the character, condition and conduct of Martin, Valton & Schumacher; that the question of fraud was exclusively a question for the jury; if the evidence

satisfied them that the policy was obtained by fraudulent repre-sentations, or was the result of a fraudulent intent on the part of Martin, Valton & Schumacher or either of them, which had been carried out either by the secreting or disposing of Schu-macher, then the defense would be established. But if the facts and circumstances given in evidence were not of sufficient strength to satisfy them that fraud had been committed, this branch of the defense failed.

The defendants' counsel requested the judge to charge, that if the jury should find that Martin and Valton, or either of them, procured or paid for the policy, for their own benefit, though with the assent of Schumacher, it was void as being a wager policy. The judge refused so to charge, and the defend-ants' counsel excepted. The defendants subsequently moved, upon a case, at special term, for a new trial. The motion was denied, and from that decision the defendants appealed to the general term. The court were unanimous in overruling most of the objections on which the appellants relied. The opinions delivered are confined to the questions on which there was any difference of opinion between the members of the court.

*H. Nicoll*, for the appellants. I. The complaint should have been dismissed at the trial on the ground that the policy of in-surance was in effect, so far as the assignees were concerned, a *wager policy*, and void by statute. (1.) Contracts of insurance are contracts of indemnity, and can only be enforced in favor of the parties claiming an interest in them, when such parties have sustained a loss, and then only to the extent of such loss. This principle is applicable to insurances upon *life* as well as to ma-rine and fire risks. (*McLaren* v. *Hartford Fire Ins. Co.,* 1 *Selden,* 151. *Goodsall* v. *Baldero,* 9 *East,* 72. *Lucena* v. *Crawford,* 5 *Bos. & Pull.* 300. *Ex parte Andrews,* 1 *Madd.* 573. *Halford* v. *Kymer,* 10 *Barn. & Cress.* 724. *Devaux* v. *Steele,* 6 *Bing. N. C.* 358. *Stockdale* v. *Dunlop,* 6 *Mees. & Welsby,* 224. *Park on Ins. ch.* 22, *p.* 419.) (2.) All con-tracts whereby a gain on the one side and a loss on the other are made dependent upon an uncertain event, are *wagers*, and

void by statute.   Such policies of insurance only as are made
for indemnity or security are excepted.   Policies of insurance
when not so made are wagers, and void.   (2 *R. S. 4th ed.* 72,
§§ 9, 10.   *Amory* v. *Gilman,* 2 *Mass. Rep.* 1.   *Buchanan* v.
*Ocean Ins. Co.,* 6 *Cowen,* 318.   2 *Bl. Com.* 459, *N. Y. ed.* 1852.)
(3.) By the assignment of a policy of insurance, the assured,
parting with his interest in the same, ceases to be the party for
whose security or indemnity the policy is held.   The contract
of insurance by such assignment becomes in effect a contract
between the insurer and the assignee, who, by force of the trans-
fer, is the party insured.   It follows, therefore, that unless the
assignee has taken and holds the policy for his indemnity or se-
curity, it is a wager within the statute, and void.   (*See cases
cited to first subdivision ut supra.*)   (4.) The plaintiffs claim
that the policy in question was absolutely assigned to Martin
and Valton, provided the assured should die during the contin-
uance of the partnership, unmarried.   It is neither averred,
proved or pretended, that said assignment was made in any sense
for the security or indemnity of Martin and Valton.   As be-
tween them and the insurer, the contract became by the assign-
ment a plain wager by which the latter made a bet of $10,000
with the former that the assured would not die during the con-
tinuance of the partnership, unmarried.   (5.) The terms "in-
demnity and security," when applied to policies on lives, may
be extended to those numerous cases where insurances have
been effected for the benefit of persons having by nature claims
for support and maintenance upon the assured, and who, it may
be presumed, would sustain a pecuniary loss by his death.   No
such state of facts is claimed to exist on the part of Martin and
Valton under the policy in question.   They had no interest in
the life of the assured.   It was solely *by his death* that they
were to be benefited.   (*Lord* v. *Dall,* 12 *Mass. R.* 116.)   (6.) If
the plaintiffs had claimed that the policy in question had been
assigned for the indemnity or security of Martin and Valton, it
should have been averred and proved how and to what extent
they had been damnified or become liable by the death of the
assured.   Nothing of the kind was done.   (*Robbins* v. *N. Y.*

*Ins. Co.,* 1 *Hall,* 325. *Romeyn on Life Ins.* 20. 2 *Burrow,* 1167, 1182, 1183. 2 *Phil. on Ins.* §§ 304, 5.)

II. The complaint should have been dismissed at the trial, on the ground that the articles of copartnership between Schumacher, Martin & Valton, did not amount to an assignment of the policy. (1.) The undertaking of Schumacher was simply a personal covenant, which gave the holders no lien on the fund. There was no such appropriation as would authorize the defendants to pay the amount of the policy to the plaintiffs. (*Rogers* v. *Hosack,* 18 *Wend.* 319. *Hoyt* v. *Story,* 3 *Barb. S. C. R.* 262.) (2.) The said agreement between Schumacher and Martin and Valton was a *wager,* dependent upon the unknown or contingent event, that Schumacher should die unmarried during the continuance of the partnership. Schumacher virtually wagered the policy of insurance on such contingency. (*Patterson* v. *Powell,* 9 *Bing.* 320. 'Cowp.* 583. *Phil. on Ins.* § 79.)

III. The jury, upon the evidence, would have been justified in finding that Martin & Valton, or one of them, procured or paid for the policy of insurance for their own benefit. The refusal of the learned judge who tried the cause to charge the jury that if they should find such to be the fact, the policy was void as being a wager policy, was erroneous, for the reasons already given. (*Wainwright* v. *Bland,* 1 *Mood. & Rob.* 481. *S. C.* 1 *Mees. & Wels.* 32.)

IV. The plaintiffs have neither averred, nor shown upon what consideration the assured, Schumacher, made the agreement with Martin & Valton, that they should have the benefit of the policy of insurance in case he died unmarried during the continuance of the partnership. The evidence in the case would have sustained the jury's finding that such agreement formed no part of the consideration of the partnership, and that it was without any consideration whatever. The learned judge erred in refusing to charge the jury as requested, that if they believed such to be fact, the said agreement was void, and conveyed no title in the policy to Martin & Valton; that the same was evidence of fraud, as showing no occasion or reason for an insurance on Schumacher's life, and that the jury might take the

latter circumstance into consideration in looking at and weighing the evidence in case of alleged death, and requiring more scrutiny in considering the same.

V. The deposition of Charles Frederick Oltman, a witness on behalf of the plaintiffs, was not admissible, and should not have been received in evidence, by reason of the omission and neglect of the witness to answer fully and fairly the *first* and *ninth* cross-interrogatories propounded to him on behalf of the defendants ; and the objections to the deposition, on that account, were properly taken at the trial. (*Kimball* v. *Davis,* 19 *Wend.* 437. *Brown* v. *Kimball,* 25 *id.* 259. *Smith* v. *Griffith,* 3 *Hill,* 333.)

*As to the first cross-interrogatory :* By this interrogatory Oltman was required, among other things, to state whether he pursued one or more occupations before he left, and to describe each particularly ; and, also, the places where, and the persons with whom he pursued such occupations. The witness, in answer to this interrogatory, stated that he was a clerk in a court of justice before he left Germany ; that he followed the mixing of liquors in Ovelegonne and in Bremen ; that he did not recollect the names of the persons that he mixed liquors for, and that he did it when traveling. The witness has wholly failed to give the title of the court of justice in which he was a clerk ; or the place where it was held ; or. the names of the persons with whom he followed said occupation. Considering the position of this witness with reference to the plaintiffs' case, the inquiry by the defendants into his previous history, was plainly material. The witness, by his mode of answering the cross-interrogatory has evaded the inquiry, and rendered it practically fruitless. *As to the ninth cross-interrogatory :* By this interrogatory the witness was required to state the business in which *after* May, 1850, Martin and Valton were engaged—of whom they bought—and to whom they sold, and the names of both, and what they bought and sold. The only answer given by the witness to this interrogatory was that he knew nothing of the business of the said firm till after the forepart of July, 1850. The interrogatory was not limited to any period of time

after May, 1850, but required an answer from the witness of all his knowledge on the subject inquired about, down to the time of taking the deposition. Having been in the employment of Martin & Valton for seven or eight months after the forepart of July, 1850, during all which time they were engaged in business, he could and should have answered the interrogatory fully, or alleged his want of all knowledge on the subject; which he has not done. The whole case plainly shows that these inquiries were plainly material.

VI. The statement in the policy of insurance, that the assured Schumacher was a *merchant,* being a warranty that he was so at the time of signing the proposals for insurance, *was a condition precedent,* to be established by the plaintiffs, by *competent proof,* in order to show a right to a recovery upon the policy. (*Craig* v. *U. S. Ins. Co.,* 1 *Peters' C. C. R.* 410.  2 *Phillips on Insurance,* 752, 753, 2d ed.  *Huckman* v. *Fernie,* 3 *Mees. & Wels.* 505.  *Wall* v. *East River Ins. Co.,* 3 *Seld.* 370.)

VII. The plaintiffs, upon the trial, gave no evidence whatever showing or tending to show that Schumacher was a merchant at the time of signing the proposals for insurance, while the proof produced on both sides fully sustains the presumption that such was not the fact. The verdict of the jury was therefore in this respect without evidence to sustain it, but directly against the evidence in the case.

VIII. A motion for a new trial upon a case is an application addressed to the discretion of the court, and will always be granted when the verdict is clearly against the weight of evidence, except in penal actions, or in those sounding in vindictive damages. (*Mumford* v. *Smith,* 1 *Caines' R.* 520.  *Astor* v. *Union Ins. Co.,* 7 *Cowen,* 202.  *Fowler* v. *Ætna Ins. Co.,* 7 *Wend.* 274.  *Abbott* v. *Sebor,* 3 *John. Cas.* 39.)

IX. The evidence given upon the trial fully established, and without contradiction, that at the time of effecting the insurance, representations were made on behalf of Schumacher, that he was a partner with Martin, and the moneyed man of the concern.

X. The testimony of Lacy and Staats conclusively establishes

that such representations were material to the risk, that they were made to remove impressions unfavorable to taking so large a risk upon the life of Schumacher, and that if they had not been made, the policy of insurance would not have been granted. Such representations, therefore, if false, rendered the policy void. (*Sibbald* v. *Hill*, 2 *Dow. Parl. Cas.* 263. 2 *Duer on Ins.* 680. 1 *Phillips on Ins.* (*last edition*,) §§ 541, 542, *and cases cited. Wainwright* v. *Bland, ut supra.*)

XI. The jury, by their verdict in favor of the plaintiffs, must have found either that said representations were not made, or if made were not material, or that the same were not untruly made. Their finding in every respect, other than the last, would have been against the evidence.

XII. If the jury found that the representations in question were not untruly made, it is submitted that their verdict is, in this respect, clearly against the weight of evidence.

(1.) As to the representation of partnership: The articles of copartnership conclusively establish that the partnership was not to commence until the 1st of June, and said articles were in fact not executed until the 30th of May; the insurance was effected, and the representation made on the 21st of May. If there had been a previous partnership, which will not be pretended by the plaintiffs, it lay with them after showing the formation of the partnership on the 30th of May, to prove such previous partnership, which they did not attempt to do. If it be contended that the partnership referred to in the representation was the one afterwards formed, it is submitted that this representation, when taken in connection with the statement that Schumacher was a moneyed man, was false, and made with the design of inducing the belief that Schumacher had contributed to the capital of the firm, when in truth the object of effecting the insurance was to enable him to assign the policy to his intended partners; the disclosure of this intention would have prevented the insurer's taking the risk, as the parties well knew. The *suppressio veri* in this case is therefore in fact a *suggestio falsi.* (2.) As to the representation that Schumacher was the moneyed man of the concern: Taken in connection with

the representation of partnership, the parties must have intended to be understood as asserting that Schumacher was the partner who had brought the money into the concern. This was palpably a falsehood; the articles of copartnership show that he contributed nothing to the firm. If the representation be held to have been simply that Schumacher was a moneyed man, then it is submitted that the evidence clearly shows that such representation was false. (1.) Nothing was shown as to Schumacher's previous history: he had been in this country for ten years, and Martin had known him for fourteen years. (2.) The services performed by Schumacher in the store—his appearance, as spoken of by Martin, in his interview with Dr. Staats—the restrictions put upon him in the articles of copartnership—the coming from Albany to New York, and remaining there without baggage for more than ten days, and getting money to pay for his board in advance, from Valton, whom he styled his boss, when taken in connection with the entire and significant omission of the plaintiffs to explain any one of these circumstances, justify the conclusion that Schumacher was not a moneyed man, within the meaning of the representation.

XIII. The peculiar circumstances of the case; its novelty; the extraordinary articles of copartnership, giving Valton and Martin an interest not in the life, but in the death of their copartner; the many elements of suspicion against the good faith of the transaction; the sudden and singular death of Schumacher as alleged; the disappearance of Martin, who was the prime mover in the whole matter; the vague and evasive deposition of Oltman, the chief witness; the examining of said witness under a commission, and thus depriving the defendants of having him examined orally before the jury; the sudden appearance of the parties in Albany, where they were all strangers; the want of all attempt to give any explanation as to their previous history; and the utter failure to show that any of them were ever possessed of any means; require that the verdict of the jury should not be sustained unless the preponderance of the evidence is clearly in favor of the plaintiffs, and which it is submitted is not the fact.

Valton *v.* National Loan Fund Life Assurance Society.

*John K. Porter*, for respondents. I. The verdict of the jury was fully sustained by the evidence. (1.) The fact of Schumacher's death was established beyond all controversy. It was proved by the evidence of Oltman, who was with him at the time he was drowned. The body was subsequently recovered, and recognized even after disinterment. The pantaloons were identified by the party from whom they were purchased, and the neck handkerchief by the production and correspondence of the two halves, one of which was worn by young Valton, and the other by Schumacher on the day of his death. The evidence of a local usage, among those drowned in the Hudson, to remain submerged for five days without drifting or bleaching, is overcome by clear and controlling proof. The coroners examined on the part of the plaintiffs, speak from facts within their knowledge, at war with the defendants' theory. It is shown also that at the time Schumacher was drowned, a south east wind was prevailing, the tendency of which would be to drift the body towards the Jersey shore. (2.) The pretense that the premiums were not paid by Schumacher is affirmatively disproved. The policy acknowledges the payment by him of the original premium ; and the receipt for the August premium, as well as the letter from Schumacher enclosing it, shows that it was paid from his funds, though transmitted by the hand of Martin. (3.) The claim that the assured was not a *merchant*, is negatived by all the evidence. He is proved to have been a liquor merchant ; to have become skilled in that calling, even in Germany, and to have pursued it as his vocation down to his death. (4.) The pretense of fraudulent *oral* representations to Lacy, the defendants agent, is equally unfounded. Schumacher personally made no oral representations ; there is no proof that he heard the jesting conversation between Lacy and Martin as to his means ; and there is no reason to suppose that if he had heard it he would have gathered its tenor, with his imperfect knowledge of our language. Lacy admits upon his cross-examination that he made no inquiry as to the means of the assured, and the question was immaterial to the risk. His alleged suspicion that Schumacher was a porter instead of a partner was at

war with his own acts, as well as the evidence. It was for the jury to scrutinize the testimony of the agent, to reconcile his conduct with his supposed suspicions, and determine in view of the whole evidence how much reliance could be placed on the accuracy of his recollection. (5.) The theory of the defendants, that Schumacher conspired with his partners to get his life insured by false pretenses, and be murdered for their benefit, is not so probable that a jury should be condemned for questioning it. Nor is it extremely probable that the first man they happened to employ in their business was ready to volunteer as his murderer; and that the time and place selected for the crime should be on a summer afternoon, in the Hudson river, in full view of two cities, and of the vessels afloat and at anchor on every side; trusting to chance for the recovery of the body, and to the murderer for the evidence of death. Nor would a jury deserve much censure who should hesitate to believe, without evidence, that Schumacher conspired with Valton and Martin to get his life insured by false pretenses, with a view of being *kidnapped and secreted* for four years, and then reappearing to share the proceeds of fraud and perjury with them and his own porter. And even if this could be believed, it would be somewhat remarkable that on the 7th of September, the body of *another man* should rise at Jersey City, in the very apparel which he wore four days before, at the Shakespeare Hotel, and with form and features so similar, as to be recognized as those of Schumacher, after being deposited for twelve days in the grave.

II. The questions of fact were submitted under a charge to which no exceptions were taken, and on these questions the verdict is conclusive. (1 *Sandf.* 260, 262. 7 *Barb.* 271, 275. 2 *Wend.* 352, 356.)

III. There was no error in the decisions of the court as to the admission and exclusion of evidence. (1.) The objection to the introduction of the deposition of Oltman was properly overruled. It was not *specific.* It did not point out any portion of the first and ninth interrogatories which the witness had failed to answer. It was unfounded *in fact.* Embarrassing as it was to answer

some *twenty questions* embraced in the first interrogatory, the witness did so fully and fairly    The *ninth* interrogatory erroneously assumed that the witness was with Martin & Co. from the 30th of May ; and he states in his answer why he is unable to give the information desired.    Besides, it is only when the commissioner neglects to *propound* the interrogatories, or when the witness *refuses* to answer, that the deposition may be suppressed.    (2.) The court properly excluded the evidence of Oltman's declarations.    Neither of the *plaintiffs* were present when they were made.    They were not offered to *contradict* the witness on any point as to which he had been interrogated.    The court were not even informed what the proposed declarations were, but were left to spell out some ground on which the offer might be relevant, or the evidence competent.    This was no part of the judge's duty.    (24 *Wend.* 381, 384.)

IV. The court properly declined to hold, or to instruct the jury to find, that the policy in question was a wager policy. (1.) Policies of insurance are not within the statutory prohibition of wagers ; and even if they would be otherwise, they would clearly be within the exception.    (1 *R. S.* 3d ed. 839, § 10.) (2.) But the defendants' contract of insurance was with *Schumacher*, and not with the assignees.    Their interest was derived from the assured through a subsequent agreement.    The fact that he was the contracting party is not only established by the proof, but admitted by the pleadings.    (3.) Schumacher had an insurable interest in his own life ; and the policy having been valid in its inception, between him and the defendants, no subsequent assignment of it by him could transmute it into a wager policy.    (12 *Mass. Rep.* 115.    3 *Sim.* 149.)    (4.) Even if the contract had been made with the assignees, instead of Schumacher, it would not have been a wager policy, for they, as his partners, had a pecuniary interest in his life.    (*Peake's N. P. Cas.* 151.    9 *East,* 72.    12 *Mass. Rep.* 115.)    (5.) If on any conceivable ground this could have been deemed a wager policy, the defendants cannot avail themselves of it, for the proposition was so framed as to conceal the ground instead of disclosing it ; nor, if the proposition had been more specific, could they have

obviated the equally fatal objection that no such defense was interposed by the pleadings.

V. Nor is it sufficient, on a motion for a new trial founded upon a case, to show error on the part of the court, either in the admission or exclusion of evidence, or in giving or withholding instructions. The appellants must go farther, and satisfy the court that the error not only *might* have produced injustice, but *has* produced it in the particular case; that the verdict upon the whole case was contrary to law or evidence, and was produced by the errors complained of; and that the parties complaining fully and fairly presented the specific point on which they relied, so that the court at *nisi prius* decided, and intended to decide, the very question raised before the appellate tribunal. (10 *Barb.* 453. 4 *id.* 324. 3 *id.* 548. 12 *Wend.* 41. 1 *Comstock*, 92, 4.)

Wright, J. I endeavored to bring to the trial of this cause the utmost care. The actors were all foreigners, Germans on the one side and Englishmen on the other, and for any thing that appeared by the evidence, of equal respectability and entitled to an equal measure of consideration at the hands of the courts. Through the probably careless discharge of duty by their agent, and his eagerness to obtain risks, the defendants were involved in a litigation for a large sum. The principal defense set up in the pleadings was, that the policy was obtained by fraud. The complaint averred the issuing of the policy, the payment of the premium, and the death of Schumacher, upon whose life the insurance was effected, none of which averments were denied by the answer. The answer alleged as new matter, that upon the application to insure, Schumacher was represented as a merchant, a partner with Valton and Martin in business, and a man of large means, which representations were untrue and avoided the policy; and that the policy was obtained by fraud, and with the fraudulent intent of Martin and Valton, with or without the concurrence of Schumacher, of soon thereafter secreting or otherwise disposing of Schumacher, and making claim under their pretended articles of partnership, on the

Valton *v.* National Loan Fund Life Assurance Society.

defendants for the amount of the insurance, and that Valton and Martin, or one of them, had secreted or otherwise disposed of Schumacher with such fraudulent intent. It was not pretended in the pleadings that Martin or Valton, or either of them, procured or paid for the policy for their own benefit, and that it was thereby void as being a wager policy. No such issue was presented or hinted at : nor when the case was submitted was there really any competent or sufficient evidence to go to the jury on the question of a fraudulent evasion of the statute against wagers.

It is admitted that upon the issues made by the pleadings, and indeed on the whole case, the questions of fact were properly submitted to the jury ; and they have found against the defendants. I anxiously desired on the trial that right only should prevail, and I am still desirous if any error in law has been committed by me, to the prejudice or injury of the defendants, that a new trial should be awarded. But I frankly confess that I am not willing or desirous, more in this instance than any other, that the parties should be allowed to present the case to another jury, for the reason only, that mystery, as my brother Harris expresses it, " still seems to envelop some of its principal features," or that a shadowy, undefined suspicion of wrong still attaches to it.

It is the opinion of one of the members of the court, that no error was committed in the admission or rejection of evidence, or in the charge or refusal to charge as requested. Another has come to the conclusion that the deposition of Oltman should have been suppressed ; that the defendants should have been permitted to prove his declarations made to their agent, as to the circumstances attending the death of Schumacher ; and that it was erroneous, under the evidence in the case, to refuse to charge, that if the jury found that Martin or Valton, or either of them, procured or paid for the policy, for their own benefit, though with the assent of Schumacher, it was void, as being a wager policy. The first two objections were but feebly urged on the trial, and the last was not thought of, as being in the case, until after the jury had been charged. Indeed, had the

first been allowed, pretty much all of the defendants' theory of
a fraudulent conspiracy to secrete Schumacher and claim the
insurance money, would have vanished, for it was upon Oltman's
"marvellously strange" narrative of the death of Schumacher,
that the theory was principally based. Under the pleadings, it
was not necessary that the plaintiffs should have introduced the
deposition of Oltman, for it was only important to prove the
death, and that was averred in the complaint, as well as the
time at which it occurred, and not so denied in the answer as to
put in issue either the fact or the date. These being material
allegations, were, for the purposes of the action, to be taken as
true. (*Code*, § 168.) The plaintiffs might have rested their
case, on showing the assignment from Martin to the plaintiff
Adams, and proving the fact that the required notice had been
given to the defendants of the death of Schumacher. But they
chose to proceed as though by the pleadings they were put upon
proof of all the material allegations in their complaint, and as
the case was novel in some of its aspects, and the sum involved
large, I was not disposed to interfere. With the view of sub-
stantial justice between the parties a most liberal construction
was given to the answer of the defendants. Had the plaintiffs
stopped after proving the facts put in issue by the pleadings,
leaving to the defendants to establish affirmatively the frauds
set up in their answer, there would have been little "mystery
surrounding the case," and nothing "peculiar in the character
and circumstances of the principal witness." The defendants
would scarcely have made an approach towards establishing the
fraud charged in their answer. As it was, not a single fact was
affirmatively shown by the defendants, bearing on the issue of a
conspiracy between Valton, Martin & Schumacher, to defraud
the insurance company by obtaining the policy, and either se-
creting, kidnapping or murdering Schumacher, that two of the
conspirators might claim the moneys secured to be paid by the
policy. They relied not on facts proved by themselves, but upon
the improbability and inconsistency of the statements of the
plaintiff's witnesses to prove Schumacher's death. Fraud was
to be inferred, not from facts and circumstances proved legiti-

mately and directly tending to the conclusion, but because the defendants had succeeded in throwing some mystery about the case, and stoutly declared that the principal witness of the plaintiffs to prove Schumacher's death was not to be credited. Oltman's deposition, with the testimony of their agent, was all the defendants had on which to go to the jury upon the questions of fraud or false representations. The objection, therefore, to the deposition was feebly put forth, but as the plaintiffs chose to offer it, and insist upon its reception, we are now to say whether there was error in refusing to suppress it.

The case states that upon the deposition of Oltman taken on commission, being offered in evidence, the defendants objected, on the ground that two cross-interrogatories, the first and the ninth, were unanswered in part : and after the deposition had been received and read the same objection was renewed, and exception taken. If this meant any thing definite, it was that the court was asked to suppress the entire deposition on the ground of a partial failure to answer what the defendants' counsel termed two cross-interrogatories. That which is called the first cross-interrogatory embraced nineteen questions ; the ninth, five questions. Which of these numerous questions Oltman had failed to answer was not pointed out : but the court was left to ascertain from an examination of the interrogatories, and indeed the entire deposition, whether the witness had failed to tell the whole truth. In what respect the interrogatories were unanswered was not specifically stated. Under these circumstances, and with such an indefinite objection, I should have deemed it an unjustifiable exercise of discretion to have suppressed the deposition. Suppose Oltman had been upon the stand as a witness, and nineteen distinct inquiries had been put to him at one time, and he had attempted to answer all of them : but the defendants' counsel supposing he had failed in part, moved to strike out the whole of his testimony, without stating wherein he had failed ; would any judge, under such circumstances, have stricken it out? I think not. And if not in such case, clearly it could not be justified when the parties join in a commission to examine a witness, and the defendants lie by until the trial, and

then surprise their adversary and the court with a vague objec-
tion.   But I think that it is only when the officer neglects to
put the interrogatories settled, or when the witness *refuses* to
answer, that the commission is deemed to have been imperfectly
executed; and the deposition for that reason suppressed.   This
is as far as any case has gone, in the courts of our state.   Can
it be when a party unites all sorts of questions in an interroga-
tory, when there is no neglect of the officer to put them to the
witness, and the witness does not refuse to answer, but gives
what he and the officer deem a proper and sufficient answer,
that the court is called upon, on the trial, to determine as to the
pertinency of a part, or the whole, of the interrogatory, and
the willful attempt of the witness to evade a full answer, and
as these questions shall be found, to receive or suppress the en-
tire deposition ?   Let this rule be established, and I venture to
affirm that four-fifths of the commissions issued to examine wit-
nesses will be found to be imperfectly executed, and consequently
to be suppressed.   But if it be conceded that evading an an-
swer to a pertinent inquiry is sufficient ground to suppress a
deposition, and that the refusal to suppress it upon a general
objection like this, is available to the defendants, was the ob-
jection well taken in this case?   It is to be observed that all
the plaintiffs proposed to prove by Oltman was the death of
Schumacher, and the circumstances attending it.   This was the
single point to which he was interrogated; and this was a work
of supererogation, for as has been remarked, the fact was not put
in issue.   There were seven direct interrogatories, and four of
them related to the witness' age and occupation, and his previ-
ous acquaintance with the parties to the action, and with Schu-
macher.   But this was enough to start the defendants' counsel
on a rambling excursion in search of something on which to
build a defense.   It is said that the plaintiffs chose to examine
the witness on commission, instead of having him in court; and
this is put forth as a reason for regarding many of the cross-
interrogatories as pertinent.   But is this really a fair argument?
The witness remained in the employ of Valton & Martin for
six months after Schumacher's death, and then left the state.

The plaintiffs could not coerce his personal attendance in court, and to obtain his testimony were driven to a commission. The agent of the defendants knew of Oltman being in Albany in September and October, 1850, and was informed that he was with Schumacher when he was drowned. He accompanied the agent to the office of an attorney, and they examined him critically respecting the circumstances of Schumacher's death. The agent caused him to be arrested on a charge of conspiracy to defraud the defendants, which charge was dismissed, and he remained in the state for months afterwards. Possessed of all the information derived from an examination of Oltman, the defendants, after this suit was commenced, in April, 1852, joined in a commission to examine him on interrogatories in the state of Indiana. Though the plaintiffs had interrogated him to but a single point, there were sixteen cross-interrogatories proposed, embracing in them nearly two hundred questions, half of which had no relation to Schumacher, or his death, or the circumstances under which he was drowned. Seven of the interrogatories, embracing fifty questions, related to the witness himself, distinct from any connection with or knowledge of Schumacher, the precise place of his birth, who were his parents, the name of his father and his occupation, where he lived, when the witness came to this country, by what route he came, what his occupation was before he left, with whom he lived, the places where he lived, and the persons with whom he pursued his several occupations, who came with him to this country, what had been his occupation each month since his arrival, who he had worked for particularly, the compensation that he had received, and generally every act of his life since his arrival in the United States. Two of the interrogatories related solely to Martin and Valton, embracing thirty-four questions respecting the pedigree of each, their business, how old the witness supposed they were, whether they were ever married, or had any children, and how many. There was but one interrogatory as to the circumstances of Schumacher's death, and that embraced fifty-three distinct questions. We are told now, that in the first interrogatory, among other things, he was required to state whether he

pursued one or more occupations before he left Germany, and to describe each particularly, and also the places where, and the persons with whom, he pursued such occupations; and that by his answer he designedly evaded the inquiries. But conceding that these precise inquiries were material and pertinent, was there any design apparent to evade answering? He was asked what his occupation was before he left Germany, and whether he pursued one or more occupations; and with whom, and where he lived, before he left. To these inquiries he answered that his occupation was that of clerk in a court of justice; that he lived with his mother, (having previously said that his father had been dead about ten years,) naming the town, county and dukedom; that he followed sometimes the mixing of liquors in Ovelegonne and in Bremen, but did not recollect the names of the persons that he mixed liquors for; that he mixed liquors when *traveling*, that is, when away from his place of residence. This was substantially answering the inquiries, and in a way that a person would ordinarily answer them. It is now said that he wholly failed to give the *title* of the court of justice of which he was clerk, or the place where it was held, or the names of the judges, or the persons under whom he acted as clerk. But did the interrogatory as to what *occupation* he had pursued suggest to the witness that he was to answer as to these things? Besides, the frame of the interrogatories was calculated to lead the witness precisely to the answers given. The first question was as to his occupation. This he answered by stating that it was that of clerk in a court. The next inquiry was whether he pursued one or more occupations; and this was followed by an inquiry, not as to what occupations he had pursued, but with whom and where he lived before he left; and he was then asked to describe with whom and where he lived; and getting back to the question of occupation, the places where, and with whom he pursued such occupations. I confess I can perceive no design to evade answering: but if the defendants have failed to get a full description of the court in which the witness acted as clerk, it was not because the witness strove to conceal the information, but because the interrogatory failed to convey to him the idea

that it was wanted for any purpose. Again; had he evaded answering fully as to the persons with whom he had pursued any particular occupation in Germany, it would have been no ground for suppressing the deposition; nor, had he been upon the stand and refused to answer, for striking out his evidence altogether. The inquiry was in no way pertinent or material. The witness could not be impeached in that way. The determination of the issues in the action did not depend on his "story" being believed in regard to these collateral and irrelevant matters, nor did it require that the court and jury should be entertained with the history of the witness' life in its minutest particulars. As well might the plaintiffs' counsel have insisted that the testimony of the principal witness for the defense, who was also a foreigner, should have been struck out of the case, for failing to answer or evading an inquiry as to his private life before leaving England. It will scarcely be pretended that the deposition of a witness taken on commission is to be wholly suppressed for the reason that there has been a failure to answer fully all the impertinent and immaterial interrogatories that the ingenuity of counsel may suggest.

The ninth cross-interrogatory required Oltman to answer as to the business in which, after May 1850, Martin and Valton were engaged, of whom they bought, and to whom they sold, to state the names of both, and what they bought and sold. Oltman had answered, to previous interrogatories, that after May, 1850, the firm of Valton, Martin & Co. were engaged in the grocery and commission business in Albany; that in July, 1850, he first went into their employ as porter, remaining until the latter part of August; that this was the first he knew of the firm, that he was then in New York, until the fore part of September, and until after the death of Schumacher, when he returned to Albany, and remained in the employment of the firm as porter until March, 1851. He was then inquired of as to the business Martin & Valton were engaged in after May, 1850, and required not only to describe this, but to name the persons of whom they bought, and to whom they sold. His answer was that he knew nothing of the business of the firm

until after the forepart of July, 1850. As the interrogatory was of the most comprehensive character, it is not probable that it could have been answered fully by anybody, much less by a mere porter in the store of Valton, Martin & Co. But he might have stated that he had no knowledge respecting the names of those with whom the firm dealt, or all or any of the articles which they bought or sold. But it is said because this was not done that the answer was palpably and intentionally evasive of proper and material interrogatories, (not that there was a refusal to answer,) and that the court should have adjudged such intention and suppressed the deposition. But I do not think so. The business in which Valton & Martin were engaged after May, 1850, so far as it came under the knowledge of the witness, had been previously given, and he had already stated that he knew nothing of it until July, 1850, nor after March, 1851. It was in no sense pertinent to the issues to be tried, to know with whom Valton & Martin dealt, or the names of their customers, or to have a specification of the articles which they bought or sold. Besides, if material, these were matters purely collateral and incidental, and in no manner affecting the main point of Oltman's testimony, and which could without difficulty be proved by other witnesses. But the whole interrogatory was impertinent and immaterial. It was not a ground of defense in the action, either made so by the pleadings or proof, that though Martin and Valton pretended to be engaged as liquor dealers, their real business was to practice a fraud upon the defendants. The whole proof showed that there was no doubt as to the kind of business in which they were engaged ; and if Martin and Valton had contemplated this as a mere show, and kept up the farce for eight months after the liability of the defendants had been fixed, if liable at all, it could have been no defense, unless Schumacher had been shown to be connected with the plot to defraud. What Martin or Valton contemplated or pretended, or what business they were engaged in, apart from Schumacher, was of no importance. Indeed, it was not at all material with whom the firm dealt, or what, particularly, they bought and sold. These inquiries could have no

bearing upon the question of a conspiracy on the part of Valton, Martin & Co. to defraud the defendants by procuring the policy, and then murdering or secreting Schumacher, that the surviving conspirators might enjoy the fruits of the diabolical fraud. Had Oltman been on the stand and an interrogatory respecting Martin & Valton alone, so general in its character, and extending beyond the period of Schumacher's alleged death, been propounded to the witness, I do not think upon his refusing to answer more fully than he did, that I should have been justified in striking out the whole of his testimony. It would have been an unsatisfactory reason for depriving the plaintiffs of the testimony of one of their witnesses because of a refusal to answer an interrogatory as to matters having no direct bearing upon the issues on trial. But still less satisfactory would be the reason, where, as in this case, there was no direct refusal, and whether the witness mistook the tenor of the inquiries or intentionally evaded answering was not clearly apparent.

I cannot bring my mind to the conclusion that there was any error in refusing to suppress the deposition, that should constrain us to grant a new trial.

2. The agent of the defendants at Albany, and through whom the policy was procured, was put upon the stand as a witness for the defendants, and among other things, testified that on the 7th of September, 1850, he heard of Schumacher's death; that Martin told him there was a person at the store that could tell him all about it; that he accompanied Martin to the store and saw Oltman, and asked him how the death occurred. The defendants then offered to show, by the witness, what Oltman said, in the presence of Martin, about the death of Schumacher. The plaintiffs objected to the evidence of Oltman's declarations, and the objection was sustained. Upon what principle they were entitled to the declarations of Oltman, or to the details of a conversation between their agent and Oltman, the plaintiffs did not inform the court on the trial; and so little confidence had they in the exception, they did not even urge it as a point to be considered on this motion. They had neither attempted nor laid any foundation for im-

peaching the witness by showing contradictory statements made by him as to a material fact. Oltman had not been interrogated respecting the conversation at the store of Valton, Martin & Co. My brother Harris is mistaken in supposing that Oltman had been fully interrogated as to what he had said on that occasion. After the offer was excluded, the defendants' agent testified that on the afternoon of the same day, Oltman went with him to an attorney's office, and he was there from an hour and a quarter to an hour and a half; and on his cross-examination he stated that the attorney questioned Oltman first, and then his brother took it up; he (Lacy) took minutes of his testimony, and so did the attorney, and he (Lacy) saw those minutes only a day or two before the trial. In the eleventh cross-interrogatory, Oltman had been asked if he did not make to Lacy or the attorney a statement of the occurrence, and the twelfth cross-interrogatory was directed to some of the particulars of the statement made at the attorney's office. To this he answered that he did not know what he had stated to them. Oltman, in answering the eleventh interrogatory, said that he first saw the defendants' agent in the store of the firm; that he asked him some questions, and then told him he was going to take him before the insurance company for examination; and he did take him to the attorney's office; but Oltman did not attempt to state the conversation at the store, or declare his want of recollection of the questions propounded to him on that occasion, or the answers given. Indeed, from the form of the offer it is quite apparent that the defendants' counsel supposed that the evidence was admissible, not because a foundation had been laid by previous interrogation of Oltman, to show that he had made contradictory statements, but because Martin was present at the time the declarations were made; and they did not even offer to show that Martin heard the conversation, or that though present, he must, from his position, necessarily have heard it. The offer was in the most general form, and nothing was stated to show the relevancy of the proposed proof. Under such circumstances, I cannot see that there is a reasonable ground, now, for imputing error in excluding the offered evi-

Valton *v.* National Loan Fund Life Assurance Society.

dence of Oltman's declarations. (*Fairchild* v. *Case*, 24 *Wend.* 381, 384.)

3. The defendants' counsel submitted eleven distinct propositions, with the request to charge each as proposed. The court refused to charge upon all the propositions in the *form* presented, except in respect to the first proposition. The fourth request was, that if the jury should find that Martin and Valton, or either of them, procured or paid for this policy, for their or either of their benefit, though with the assent of Schumacher, then the policy was void, as being a wager policy. This the judge declined to charge, and I think he might safely have put his refusal upon the ground that there was no question of the kind in the case. The answer of the defendants did not allege or set up any matter or thing, showing the policy to have been void under the statute against wagers; nor was it pretended that Martin and Valton, or either of them, procured or paid for the policy, for *their* benefit, with the assent of Schumacher; even if the proof of those facts would have made it a gambling or wagering policy within the statute. There was no proof except a feeble effort of the defendants' agent, evidently thought of long after the transaction occurred, to give it such a coloring, that Martin or Valton, or either of them, were the persons really effecting the insurance, and not Suhumacher, or that Schumacher was put forward by Martin as the mere instrument through whom the statute against wagers might be evaded. Even this effort conflicted with all the other evidence in the case, written or unwritten, with the acts of the defendants, and even of the agent himself. There was no sufficient evidence to warrant the jury in finding that either Martin or Valton, with the assent of Schumacher, procured the policy for the exclusive benefit of either. Indeed, the evidence showed a state of facts directly hostile to this theory. Schumacher was the person with whom the defendants contracted, and the legal presumption is that the policy was for his benefit, and not for that of any other person. He had an insurable interest in his own life. No use by him of the policy, *subsequent* to the contract of insurance, could convert it into a wager policy. If valid in

its inception he might dispose of it as he pleased. I do not understand that there can be a wager policy within the statute, unless the contract of insurance is made with a party who has no insurable interest in the life insured ; and that the term can never apply when the policy is issued to the party whose life is insured, and when thus the contract is made directly with him. (*Peake's Nisi Prius Cases*, 150. *Godsal* v. *Bolden*, 9 *East*, 72. *Lord* v. *Dall*, 12 *Mass. R.* 115.) Schumacher being the person with whom the defendants dealt, (and they assumed not to deal with any other,) he had confessedly an insurable interest, and no arrangement for the future disposition of the policy, made with a third party, either before or after it was obtained, certainly not afterwards, could make it a wager policy. Martin or Valton might have contemplated the securing of a subsequent interest in the policy, but if Schumacher was at all interested at the inception of the contract, such contract could not be void, for the reason that the statute against wagering had been violated. Schumacher, at the time the policy was procured, may have possessed but small means ; Martin may possibly have advanced the money for the payment of the first premium, but if it were so, the defendants contracted with Schumacher ; he was exclusively the party insured. The policy was made in whole or in part for his benefit. It was optional with him whether Martin or Valton should ever have any interest in it ; and indeed, by subsequent arrangement, they were excluded from all interest, except upon the happening of the contingency of Schumacher's dying unmarried, during the continuance of the copartnership. It was manifestly, therefore, no wager policy. To have made it such, Martin or Valton, without any pecuniary interest in Schumacher's life, must have insured it, for their exclusive benefit ; and it is even doubtful—the policy not having been issued to or the contract made with them—whether the defendants could avoid this contract upon the ground that it was prohibited by the statute against wagers. In the case of *Wainwright* v. *Bland*, (1 *Mood. & Rob.* 481; *same case*, 1 *Meeson & Welsby*, 32,) the policy was issued in the name of Helen F. P. Abercrombie, who was an orphan, and resided

Valton v. National Loan Fund Life Assurance Society.

with the plaintiff, a near relative. Her only means of subsistence was an annual pension of ten pounds. At the trial, it clearly appeared that the policy was effected by her, by the persuasion and for the benefit of the plaintiff and his wife, who was the half sister of the assured ; and that the premiums were paid by the plaintiff. At her first attendance at the company's office, with Mrs. Wainwright, she represented that the insurance was intended to secure a sum of money to her sister, which she should be able to do if she outlived the term of two years ; and that on being asked by the actuary whether she had effected insurances with any other office, she answered, " I wish to insure £5000, but as your office only takes £3000, I shall propose £2000 to some other office." It was proved that she had *previously* effected insurances, with various offices, all of them for a period of two years only, to the amount in the whole, of £11,000. On being informed subsequently, by the actuary, that the directors were much displeased at her not answering his former question in a straightforward way, she said, " I know very little of the business myself ; I do as my friends direct me." She died suddenly, some two months after effecting the insurance, having by her will bequeathed the benefit of her policies to her sister, and appointed the plaintiff her sole executor. The plaintiff, as her executor, swore her personal property not to exceed £100 ; and it was proved that she was in fact in indigent circumstances, and without the means of paying the premiums. Lord Abinger left it to the jury to say, *first*, whether the assurance was effected by the deceased *bona fide* for her own benefit, or as the agent of Wainwright ; *secondly*, whether the false representations made by Miss Abercrombie related to a matter material to be known by the defendants as insurers. The jury found that she effected the insurance as the plaintiff's agent, and for his benefit, and that the false representations were on material points ; and a verdict was thereupon entered for the defendants. On the motion for a new trial, in the court of exchequer, the rule was refused, on the ground that the policy was avoided by the false representations, both Lord Abinger and *Parke, B.* conceding there was doubt on the other

point. So that in a case baldly showing that the insurance had not been effected *bona fide* by the person whose life was insured, for her own benefit, and where the jury found that she acted in obtaining the policy, not for herself, but as the agent of another, and for his benefit, it was doubted whether the policy was thereby avoided. The court was unwilling to rest its decision on this ground, or to hold that a person cannot insure his own life, for the benefit of another who has no insurable interest, and who himself pays the premium; or that a contract made and a policy effected under those circumstances, falls within the statute against wagers, and that such a contract and policy may be avoided. Our statute does not define what shall be a wagering policy, but in terms inhibits courts from construing it so as to include within its operation "insurances made in good faith for the security or indemnity of the party insured," and that the section declaring void " all contracts for or on account of any money or property or thing in action, wagered, bet or staked," might not receive too enlarged a signification, expressly, by a succeeding section, provides that it shall not be extended so as to prohibit or in any way affect insurance contracts made in good faith, for the *security* or *indemnity* of the insured party. The statute nowhere declares that only insurance contracts of the latter description shall be valid. The mischief against which it was exclusively aimed was wagering, " made to depend upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever," (1 *R. S.* 662, §§ 8, 10.) It is only when an insurance contract falls within the category of a mere wager or bet—a simple gaming adventure—that the statute can even by construction apply. It is a question of legal construction always, whether an insurance contract comes within the purview of the statute against betting and gaming. Courts have held that where A. insures the life of B., having no pecuniary or other insurable interest in such life, it is a gaming transaction merely, and being forbidden, any contract for or on account thereof is void; but it has never been adjudged (at least no such case has come under my knowledge,) that where a party insures *his own life*, even for the benefit of

another, the latter advancing the money to pay the premium, such contract is void for the reason that the statute against betting and gaming has been violated. Nor have I ever before heard it pretended that the insurer could avoid his contract made with the person whose life was insured, and who had an unquestionably insurable interest, because the latter chose to insure for the benefit of a friend, even though that friend advanced the premium, and may have urged the making of the contract ; and this too upon the ground exclusively of an alleged· evasion of the statute against wagers. In *Lord* v. *Dall,* (12 *Mass. R.* 115,) a brother contracted with an underwriter, giving his own note for the premium, and took the policy in the name of his sister, and for her benefit. She was a person of no property, and at the time of the insurance was entirely dependent for subsistence on her brother. Yet it was not pretended that the policy was void for the reason that it was procured and paid for by the brother. But a question was raised, which was one of law purely, whether she had an interest in the subject matter insured, else otherwise, as was said by the court, it would be a mere wager policy.

It is to be observed, that in the case at bar the fact was assumed by the defendants' counsel, that Martin & Valton had no insurable interest in the life of Schumacher, (an assumption not sustained by the evidence,) and assuming this, the judge was asked to instruct the jury that if they should find that they, or either of them procured or paid for this policy, (that is, the one on Schumacher's life, and which the evidence of the defendants showed that he had applied for and obtained,) for their or either of their benefit, though with the assent of Schumacher, then the policy was void as being a wager·policy. The request was, substantially, that the judge should charge the jury that either the procurement of the policy by Martin & Valton, for their benefit, *or* the payment of the premium by them, with the assent of Schumacher, constituted the policy which had been applied for by and issued to the latter, a wager policy, and rendered it void. In the face of the defendants' own evidence that Schumacher applied in writing for the policy, that

it was issued to him, and that the defendants receipted the premium as being paid by him, I was asked to submit the question of fact to the jury whether Martin & Valton, or either of them, had procured or paid for the policy for their joint or separate benefit, there being no evidence whatever connecting Valton with its procurement, and none really connecting Martin, except the fact alleged by the defendants' agent, that Martin originally suggested the insurance, and accompanied Schumacher when the application was made, and when he was examined by the defendants' examining physician. And further I was asked to allow the jury to speculate on the question whether Martin & Valton did not really pay the premiums, because the defendants' agent had sworn that Martin had handed him the money, and a hotel keeper had testified that Schumacher proposed at one time, in New York, to have Valton become responsible for his board; though it was shown that the premium for the second quarter, which Lacy testified that he *understood* had been left at his house by Martin, in his absence, had come from Schumacher himself. And further, permitting the jury to roam in the region of conjecture and speculation, should they finally conclude that the whole thing was a device of Martin & Valton to obtain an insurance upon Schumacher's life, with his assent, for their benefit, I was to instruct them that the policy issued to Schumacher was, in law, a wager policy, and being void, their verdict must be for the defendants. Either the procurement of the policy or the payment of the premiums, if they or either of them contemplated a benefit from the insurance, according to this theory, made the transaction a forbidden wager, and the instrument issued to Schumacher *ipso facto* a wager policy. My brother, Harris, is not inclined to go to the extent of holding that, in law, it would be what has been heretofore denominated a wager policy; but he thinks the transaction would be palpably an attempt to *evade* the statute against betting and gaming, and for that reason the jury should have been told that the policy was to be avoided. But if this were the law, (of which I entertain grave doubts,) I was not requested thus to instruct the jury. If the question had been upon an evasion of

Valton *v.* National Loan Fund Life Assurance Society.

the statute, there would have been still a further question of fact for the jury to find, viz: an intention of the assured to evade it.

The policy issued to Schumacher, and upon which the action was brought, was in no legal sense a wager policy. Nor, had the jury found the facts that it was issued to Schumacher by the procurement of Martin or Valton, for their exclusive benefit, or that the premiums were paid by them, would it have been invalid. Besides, there was no competent evidence in the case to sustain such a finding, or to justify the court in submitting the question of an attempt to evade the law against wagers. No such issue was made by the pleadings, and none such was tried. It is quite probable that Schumacher, at the time of effecting the insurance, was possessed of but little means. It required but little, as the quarterly premium was less than seventy dollars. It may be·that Martin urged the making of the contract, and aided in its successful completion; but after all, the insurance was effected by Schumacher, not as the agent of Valton & Martin, and for their exclusive benefit, but for the benefit, in part at least, of the party whose life was insured. It is not very difficult, from the evidence, to discover the motive which induced the making of the contract. Martin, Valton and Schumacher proposed to form a partnership in the business of liquor dealers. The two former alone possessed capital to any extent; but Schumacher's services were required, as he was skillful in what is termed mixing liquors. He, though advancing no capital, was to share equally in the profits, from the beginning. In lieu of capital, and as a security or indemnity to his copartners, an insurance was effected on his life; and with the understanding that if he should die, unmarried, during the continuance of the copartnership, the benefit of the policy should go to the survivors of the firm. Martin and Valton were men with families; Schumacher was single. If he married, his copartners were to take no benefit from the insurance. He was young and healthy; and as the defendants' examining physician certified, " a good risk," and one which he recommended them to accept. The defendants' agent was eager to obtain the risk,

and abated not a jot, though believing Schumacher, from his dress and demeanor, to be the porter, and not a partner in the firm. The defendants took the risk, and received the first quarterly premium. In August, 1850, another premium was received, which extended the policy to the 15th of November, 1850; and there is no reason to suppose, from the conduct and acts of the agent, that had Schumacher survived to the latter period, there would then have been any attempt to repudiate the contract, or that he would not have receipted the premium, then payable by its terms. But Schumacher, as was alleged, was drowned in September, 1850, and while the policy was in force; and from thenceforth the defendants refused to perform their contract, doubting the death of Schumacher, but if dead, alleging as a principal reason for refusal, not that it was a wager policy, or that the statute against wagers had been intentionally evaded—not that in fact it was the policy of Martin & Valton, though issued to Schumacher, and hence void in its inception; but that it had been procured by fraud. The jury found that Schumacher was drowned in September, 1850, and that the policy was not procured by fraud. They found in favor of the plaintiffs upon all the issues made by the pleadings. That verdict is not against evidence, and though the amount in controversy be large, the defendants should be held to their contract. No vague suspicion of unfairness should induce a struggle on our part, after the issues of fact have been adjudged in favor of the plaintiffs, to search out some legal " loop hole," through which the defendants may get the case to another jury.

With an anxious desire to correct any error of law that I may have committed on the previous trial, I have not been able to persuade myself that those suggested by my brother Harris, were errors. I shall, therefore, vote for denying a new trial.

Watson, J., concurred.

Harris, J., (dissenting.) This case is characterized by a degree of novelty far beyond any thing of the kind with which I have before met. Some of the circumstances are so strange, indeed, that they demand the most active scrutiny. The prin-

cipal actors, Valton, Martin, Schumacher and Oltman, were all Germans. About the 1st of May, 1850, Valton, Martin and Schumacher made their appearance in Albany, and pretended to engage in the liquor business, as copartners. Martin had, indeed, made application for a policy of insurance for $10,000 upon the life of a friend of his partner as early as February or March in that year, but where he then resided, or how he came to make the application, does not appear. Of the previous history of the parties we learn but little from the case, and that, chiefly, from the testimony of Oltman. Valton, who had been a tanner, and at one time had kept a tavern in Germany, came to New York in January, 1848. He lived with his son-in-law, who kept a grocery and liquor store in New York, doing nothing. Martin, according to Oltman's testimony, had traveled in Germany, taking orders for liquors, cigars, &c. When he came to this country does not appear, but Oltman speaks of having seen him in New York three years before the trial. He told Oltman that he lived in the upper part of New York and sold liquor, but Bussing, Valton's son-in-law, says that he had lived in New York eight years, and that during that time Martin had not been in business there. Schumacher, it seems, was from Bremen. Oltman says he knew him there more than twelve years ago. He saw him often " *at the public houses, nights,*" but never at his place of business, though he thought he was a clerk or bookkeeper in a wine store. He told Oltman that he came to this country ten years ago, but where he had been, or how he had been employed, we are not informed. The first we hear of him in America is, when he made his appearance in Albany in May, 1850, as a member of the firm of Valton, Martin & Co. The account which Oltman gives of himself is, that in Germany he had been a clerk in a court of justice, and when traveling he mixed liquors. He came to this country, late in the year 1849, and was without employment until March following, when he hired himself to a farmer on Long Island for a year, at *five* dollars a month. His employer says he found him a little *tricky,* and on the first of July he left and came to Albany, and became a porter for the firm of Valton, Martin &

Co., receiving wages at the rate of $15 per month and boarding with Martin. He left Albany in March, 1851, and went to Milwaukie. From that time to September, 1852, when he was examined upon commission, at La Porte in the state of Indiana, he had been drifting about, remaining but a few weeks in any single place, and without any steady employment.

Whether any of the parties had any money when the business was commenced at Albany, does not appear. The articles of copartnership do not require either party to furnish any capital, and there is no evidence that any was in fact contributed. Mr. Tracy, of whom they hired their store, at a rent of $250, and whose place of business was opposite theirs, says they appeared to be doing a *limited* business. He had dealings with them to the amount of five or six hundred dollars, selling them goods upon a credit of three months. Mr. Lacy, whose office was also opposite the store, had his attention frequently directed to it, and saw that little or nothing was going on there. He saw a few barrels lying there, and occasionally saw Schumacher go out with demijohns and baskets of liquor. That three partners, engaged in such a business, should require the services of a man like Oltman, as a porter, especially when Schumacher, according to the evidence, continued, as well afterwards as before, to act as the porter of the establishment, is a little remarkable. Valton spent much of his time in New York, and the only business in which Martin is shown to have been engaged was that of obtaining and securing for the benefit of himself and Valton this large policy upon the life of Schumacher.

When Schumacher finally left Albany, or under what circumstances he left, the case does not disclose. Bussing speaks of having seen him at his store several times—he mentions three or four occasions—between the latter part of May and the middle of August. That he was destitute of money appears from the fact that when, on the 23d of August, he went to the Shakespeare Hotel to board, he proposed to pay for his board in advance, as he had no baggage, and said he would fetch the money from his *boss*, referring to Valton. That he had been staying in New York before he went to the Shakespeare Hotel, appears

from the fact that the letter which purported to enclose to Martin the second quarter's premium upon his policy, bears date, and was postmarked in New York two days before. Nor is it very likely that he would have had occasion to send back such a letter, if he had himself but just before left Albany. What he was doing all this while in New York does not in any way appear, except that Oltman says he told him he went to New York to procure a store for the firm. That this was in fact his business, there is not much reason to believe. There is no evidence that the firm contemplated either a removal to New York, or the establishment of a branch of their business there. And, besides, Valton was already there, and had been for a considerable part of the summer, and if a store was desired, he would have been, it would seem, quite competent to obtain it.

Again; it is a little singular that when Valton and Schumacher were both in New York, Oltman too should take occasion to go, and to remain there for several days. He says he went to look for a *friend* that he heard was to be there. Whether that friend was Schumacher does not appear. At any rate, he was so fortunate as to find him standing upon the wharf, upon his arrival, and we hear nothing more of any other friend. And then, the incidents connected with the drowning, as they are related by Oltman, are *marvellously strange.* The very proposition of Schumacher to go a fishing, at such a time, and in such a place, and under such circumstances, is strange. The account given by Oltman of the manner in which the accident occurred, is strange. The conduct of Oltman, afterwards, is strange. It is strange, that though he afterwards went to the man of whom the boat was hired to know if he had obtained it, he should be entirely unable to give any information either as to his name or residence, so that he may be found. It is strange, too, that after the body alleged to be that of Schumacher was found, there was no one to identify it but this same witness Oltman. It is a suspicious circumstance, too, that Martin, after having sold out his interest in the policy to the plaintiff Adams, should have disappeared, and that no one, neither Bussing nor Oltman, should know what had become of him. He might have

been a most material witness in the case.    There are many circumstances which need explanation, and which might, perhaps, have been explained by him, if the transaction was entirely fair.

But the evidence was fairly and properly submitted to the jury, and their verdict upon the question of fraud is conclusive. The application for a new trial must, therefore, be denied, unless some error has been committed, either in the admission or rejection of evidence, or the refusal of the judge to charge as requested by the counsel for the defendants.    I proceed, therefore, to notice some of the exceptions taken upon the trial.

By the *first* cross-interrogatory, the witness Oltman was required to state what was his occupation before he left Germany, and whether he pursued one, or more, and with whom and where he lived.    He was also required to describe each occupation particularly, and the places where, and the persons with whom he had pursued it.    The only answer to these inquiries is, that his occupation before he left Germany was that of a clerk in a court of justice ; that he lived with his mother in Ovelegonne ; that he sometimes followed the mixing of liquors in Ovelegonne and in Bremen ; that he did not recollect the names of the persons for whom he mixed liquors—he did it *when traveling*.

The *ninth* cross-interrogatory required the witness to state what was the business in which, after May, 1850, Martin & Valton were engaged, and of whom they bought, and to whom they sold, and what they bought and sold.    To this his only answer was, that he knew nothing of their business until afer the forepart of July, 1850.

Both these interrogatories were pertinent.    The witness was a stranger and a foreigner.    His testimony was of vital importance in the case.    His story, which must be believed, or the action must fail, was such as would not be likely to be believed without full confidence in his integrity.    The plaintiffs, instead of bringing him into court, had chosen to examine him upon commission, in a remote part of the country.    Under these circumstances, it was the right of the defendants to have all the tests of credibility within their reach applied to him.    It was natural and peculiarly proper that they should inquire into the

history of his life.   They were entitled to a full and explicit answer to each inquiry.   This they did not receive.   When called upon to state what his various occupations had been, and to describe each particularly, and the places where, and the persons with whom such occupations had been pursued, the only answer is, that before he left Germany he was clerk in a court of justice, and that he sometimes followed the mixing of liquors, &c.   These answers are evasive and unsatisfactory.   They furnish no aid in determining what the life of the witness had been, or what really had been his pursuits.

The answer to the ninth cross-interrogatory is still more objectionable.   The witness had been in the employ of Valton & Martin from the forepart of July, 1850, until March, 1851.   As appears from the case, he was the only person in their employ. The ground of defense in the action was, that though Valton, Martin & Co. pretended to be engaged in business as liquor dealers, their real business was to practice a fraud upon the defendants.   Under such circumstances, they had a right to a full and direct answer to the inquiry of whom Valton & Martin bought, and to whom they sold, and what they bought and sold. The inquiry embraced the whole period in which they were engaged in business, after May, 1850.   The answer is palpably evasive.   It was proper enough for the witness to state that he had no knowledge in respect to the business prior to the forepart of July, but that certainly was no reason why he should be excused from stating what he knew about it, after that date. Had the witness been upon the stand at the time, the presiding judge would not have hesitated to require him to answer the interrogatories more fully.   If he had refused, the whole of his testimony might have been stricken out.

The rule in respect to the examination of witnesses upon commission is, that the witness must answer all the interrogatories *substantially*.   A failure to do so, is fatal to the whole deposition.   The reason of the rule is obvious.   Where a witness has assumed to withhold his answer to a part of the interrogatories, the fair inference is, that the commission has been imperfectly executed, or that the deposition does not contain the

whole truth. It is no hardship upon a party that, when he is excused from bringing a witness into court, so that he may be cross-examined in reference to his answers upon his direct examination, he should at least be required to obtain from him full and explicit answers to such interrogatories as may be prepared for his cross-examination, before he testifies. (*See Kimball* v. *Davis*, 19 *Wend.* 437; *Brown* v. *Kimball*, 25 *id.* 259.; *Smith* v. *Griffith*, 3 *Hill*, 333.) It is a question to be determined upon the trial, whether the witness has omitted to answer any material interrogatory. If he has, the deposition is to be rejected, on the ground that the witness has not told the whole truth. I think the objection in this case was well taken. Upon the issue of fraud, it was clearly pertinent to ascertain the nature and extent of the business in which Martin and Valton were engaged. These were matters peculiarly within the knowledge of the witness. Appropriate interrogatories were framed to call out such knowledge, and yet the defendants have entirely failed to obtain any answer upon the subject. The commission must, therefore, be deemed to have been imperfectly executed.

I think, too, the defendants should have been permitted to show what Oltman had said in relation to the death of Schumacher. He was the only witness to prove the strange circumstances connected with that event. He had been asked in the eleventh cross-interrogatory, whether he had made a statement of the occurrence to Mr. Lacy, and in the twelfth interrogatory, whether he had stated to Mr. Lacy that they were not fishing when Schumacher fell overboard, or that he fell overboard in a fit, or that the witness fell overboard also, or that he knew that Schumacher's life was insured, or that Valton had told him so, or that Schumacher had left Albany and gone to New York to look for a place to keep a store, or that Schumacher when he was drowned had on yellow nankeen pantaloons: To all this, the witness had answered merely, that he did not know what he had stated on the subject. Mr. Lacy, being examined as a witness for the defendants upon the trial, stated that on the 7th of September, Martin came to his office, and informed

Valton v. National Loan Fund Life Assurance Society.

him of the death of Schumacher. Upon asking him how he ascertained it, he said there was a person at his store who could tell him all about it ; that he went with Martin to his store, and there saw Oltman ; that he asked him how the death occurred. I cannot see why it was not competent for the defendant to show by Lacy what Oltman then said on the subject. Martin, who was then a party in interest, had referred to Oltman for information on the subject. He was present when the statements were made. Oltman had been fully interrogated as to what he had said on that occasion, and to the whole he had simply answered that he did not know what he had said. The foundation had thus been laid for the admission of any contradictory statements which Oltman may have made when giving to the witness Lacy an account of the circumstances, immediately after the death was alleged to have occurred. I think the learned judge erred in excluding the evidence.

It was insisted upon the trial that the evidence warranted the jury in finding that, though the policy was taken in the name of Schumacher, yet it was in fact the policy of Valton & Martin, or one of them. The defendants' counsel accordingly asked the judge to charge the jury that if they should find that Martin or Valton, or either of them, procured or paid for this policy, for their own benefit, though with the assent of Schumacher, it was void, as being a wager policy. I am inclined to think the defendants were entitled to have the jury so instructed. Valton & Martin had no such pecuniary interest in the life of Schumacher as would entitle them, for their own security or indemnity, to insure his life. A policy taken in the name of either or both of them would have been void as a wager policy. (1 R. S. 662, §§ 8, 9, 10.) They could not, by merely obtaining the use of Schumacher's name, accomplish indirectly what they could not do directly. If the policy, from the first, really belonged to Valton & Martin, or one of them—if in fact, Schumacher never had any interest in it, then it was but an attempt to evade the statute against wagers, to take the policy in the name of Schumacher. I am inclined to think the jury would have been warranted in finding that this was so.

According to the testimony, Martin was the only man who ever interested himself to procure the policy. Long before Schumacher came to Albany, he had applied to the defendants' agent for a policy of $10.000 on the life of a friend. It was he that applied for the preliminary papers. It was he that answered the objections made by the agent, and again by the examining physician, to the taking of such a risk. It was he that, on both occasions, paid to the agent the premium of insurance. From first to last, the whole transaction seems to have been under his special management and supervision. Indeed, by the very terms of the articles of copartnership, it was only in case of a dissolution of the partnership before the death of Schumacher, or his marriage, that he could have any interest in the policy. Under these circumstances, the jury might well have found that the whole thing was designed for the exclusive benefit of Valton & Martin ; that the premiums were in fact paid by them for their own benefit, and that the pretense that money had been forwarded from New York by Schumacher to pay the premium for the second quarter, when he was shown to have been so destitute that he was obliged to obtain money from Valton to enable him to pay four dollars for a week's board, was only designed to conceal the more effectually the real transaction.

Whether a person can insure his own life for the benefit of another who has no insurable interest, and who himself pays the premiums, is a question which has not been adjudged. It came before Lord Abinger twice, at the circuit, in *Wainwright* v. *Bland,* (1 *Mood. & Rob.* 481 ; *Same case,* 1 *Mees. & Wels.* 32,) but upon the review of the case, the motion for a new trial was decided without touching this question. In that case, the policy was in the name of Helen Francis Phebe Abercrombie. She was an orphan, of the age of twenty-one years, and resided with the plaintiff, who was a near relative. Her only means of subsistence was an annual pension of ten pounds. In October, 1830, she had, in company with the plaintiff's wife, applied for and obtained the policy in question. She had previously obtained other policies, in all amounting to £16.000,

Valton *v.* National Loan Fund Life Assurance Society.

the annual premium upon which was £200. The money to pay the premium was lent to her by the plaintiff. She died in December after she had obtained the policy, leaving a will by which she appointed the plaintiff her executor. It was proved that shortly before her death she had assigned two other policies to the plaintiff, for a nominal consideration. Evidence was also given to show that misrepresentations were made at the time of obtaining the policy, in relation to other insurances, and the object in effecting the insurance. Lord Abinger charged the jury that the question in the case was, who was the party really and truly effecting the insurance. Was it the policy of Miss Abercrombie, or was it substantially the policy of Wainwright, the plaintiff, he using her name for his own purposes? If it was the policy of Miss Abercrombie, effected by her for her own benefit, her representative was entitled to put it in force. The plaintiff might lend her the money to pay the premium, and yet the policy continue her own. But if, looking at the strange facts which had been proved, the jury should come to the conclusion that the policy was in reality effected by the plaintiff; that he merely used her name, himself finding the money, and meaning, by way of assignment, or by bequest, or in some other way, to have the benefit of it himself, then the transaction would be a fradulent evasion of the statute, and their verdict should be for the defendant. The judge then proceeded to submit to the jury the further question as to misrepresentations, and concluded by saying that the main question was, whether the policy was *bona fide* the policy of the deceased; that if it was, and no material fact was concealed from the underwriters, the verdict should be for the plaintiff; otherwise for the defendants. The jury having disagreed, the cause was again tried before the same judge. He recommended the jury to find a verdict for the defendants, if they thought the policy was really and substantially the policy of Wainwright, the plaintiff, he putting forward Miss Abercrombie as a mere instrument, and effecting the policy in her name, with the design of getting the benefit of it himself either by will or assignment or by some other means; or if they thought the

misrepresentations as to the motive of the assured in effecting the policy, or as to the policies already effected, were misrepresentations of facts material to be known by the insurers. The jury found a verdict for the defendants, and added that they were of opinion that the policy was substantially the policy of Wainwright himself, and also that the mirepresentations were of facts material to be known by the insurers. Upon the motion for a new trial, Lord Abinger himself, and Park, B., both said there might be some doubt upon the first point; but, without giving any opinion upon this question, the verdict of the jury was sustained upon the point of misrepresentation.

The question, therefore, cannot be regarded as having been determined by express adjudication. But, it seems to me to be within the plain meaning of the statute, and obviously within the mischief contemplated by the legislature. The object of the statute was to prevent wagering and speculative policies by third persons having no interest in the subject of insurance. "Insurances made in good faith for *the security or indemnity* of the party insured," are alone declared to be valid. If this policy was, in the language of Lord Abinger, really and substantially the policy of Valton & Martin, or one of them, they putting forward Schumacher as a mere instrument and effecting the policy in his name, with the design of getting the benefit of it themselves, the contract is not within the exception of the statute protecting insurances made in good faith for the security or indemnity of the party insured. There was neither security nor indemnity in the case. It was a mere wagering policy and within the prohibition of the statute. (*See* 3 *Kent's Com.* 369, *note d.*)

The motion for a new trial on the ground of surprise could not have prevailed. Such a motion is properly made at a special term, as a non-enumerated motion. If the court deem it proper to have it heard with a motion for a new trial upon a case or exceptions, an order may be made to that effect. In this case, the motion was made at a special term, at the same time the motion was made upon the merits. It is too late now,

when the question comes up on an appeal from the order, to insist that the motion was irregular.

But upon the merits, the motion could not be granted. The defendants' counsel, according to his own statement, instead of requiring the attendance· of Adams and Parke by subpœna, thought fit to rely upon the assurance of Adams that he would attend the trial. It is indeed, a little singular that both Adams and Parke, situated as they were in reference to this action, after attending upon the trial two days, should have business which required that they should absent themselves, while the evidence was being produced. Such an occurrence was undoubtedly a surprise upon the defendants' counsel. But having failed to put them under legal obligation to attend, they are chargeable with a want of legal diligence, which is a sufficient answer to a motion for a new trial on the ground of surprise.

But, for the reasons already stated, I think there should be a new trial. Nor do I regret to find myself brought to this conclusion. The novelty of the case; the mystery that still seems to envelop some of its principal features; the character and circumstances of the chief actors in the transaction, and especially the principal witness in the case, all tend to encourage the belief that the ends of justice may be advanced by allowing the parties to present the facts anew before another jury.

New trial denied. ·

ALBANY GENERAL TERM, December 4, 1854.  *Wright, Harris* and *Watson,* Justices.]